# IN THE SUPREME COURT OF IOWA

No. 10–1516

Filed April 13, 2012

**RHONDA HALL,** Individually and as
the Injured Parent of Malika and Miranda,
and **BOB HALL,** Husband of Rhonda Hall,

    Appellants,

vs.

**JENNIE EDMUNDSON MEMORIAL HOSPITAL**
and **NEBRASKA METHODIST HEALTH SYSTEM, INC.,**

    Appellees.

---

Appeal from the Iowa District Court for Pottawattamie County, Gregory W. Steensland, Judge.

After a bench trial, plaintiffs appeal and defendants cross-appeal from district court's judgment in favor of defendants in an action for negligent credentialing. **AFFIRMED.**

John M. French of Law Offices of John M. French, Council Bluffs, and Joseph B. Muller and Ronald J. Palagi of The Law Offices of Ronald J. Palagi, P.C., L.L.O., Omaha, Nebraska, for appellant.

Michael W. Ellwanger and Michael P. Jacobs of Rawlings, Nieland, Killinger, Ellwanger, Jacobs, Mohrhauser & Nelson, L.L.P., Sioux City, for appellee Jennie Edmundson Memorial Hospital.

Robert A. Mooney and Michael J. Whaley of Gross & Welch, P.C., L.L.O., Omaha, Nebraska, for appellee Nebraska Methodist Health System, Inc.

**HECHT, Justice.**

The plaintiffs in this case sued a surgeon alleging negligent performance of a pancreaticoduodenectomy and sued a hospital contending it negligently granted credentials to the surgeon. In this appeal from a bench trial, the plaintiffs contend the district court applied the wrong standard of care in adjudicating their claim of negligent credentialing against the hospital. Because we conclude the district court applied the standard of care advocated by the plaintiffs and substantial evidence supported the district court's conclusion that the hospital did not breach the standard of care, we affirm the district court's judgment in favor of the defendants.

## I. Background Facts and Proceedings.

On April 25, 2007, Rhonda Hall underwent a pancreaticoduodenectomy, also known as a Whipple procedure, at Jennie Edmundson Memorial Hospital (JEMH). The procedure was intended to discern whether a mass situated on the neck of Hall's pancreas was malignant and to remove it if it was not. Dr. Eric Bendorf, a board certified general surgeon, performed the surgery.

Dr. Bendorf had originally sought and was granted temporary general surgical privileges[1] at JEMH when he concluded his residency in 1997. Afterwards, JEMH reviewed Dr. Bendorf for reprivileging approximately every two years. For each request for renewal of the doctor's privileges, JEMH conducted research on Dr. Bendorf's

---

[1]The parties acknowledge that the terms "credentialing" and "privileging" were used interchangeably at trial. However, the plaintiffs note that although the terms are closely related, they do refer to distinct concepts. According to the plaintiffs, "credentialing" refers to the process of determining whether a doctor is qualified to be on the medical staff. "Privileging" refers to the determination by the hospital as to which specific procedures a doctor will be allowed to perform within the hospital.

experience and qualifications, beginning with a consultation with the Nebraska Credentialing Verification Organization (NCVO), which gathers information from schools and teaching hospitals. JEMH also reviewed internal information about Dr. Bendorf's work within the hospital, conducted a criminal record check, and reviewed his history, if any, of malpractice claims (the record indicates Dr. Bendorf had no malpractice claims prior to Hall's surgery). The information gathered was then considered by a series of JEMH committees. The first of these committees, which includes a physician serving as Vice President for Medical Affairs, reviewed the packet of information to ensure it was complete. Next the packet was forwarded to the chair of the surgical department. After approval by the surgery department chair, the request moved on to the credentialing committee which included doctors, the chief nurse, and several administrators. After approval by the credentialing committee, the packet was forwarded to the hospital's executive committee, a group comprised of medical staff from each department of the hospital. After approval by the executive committee, the packet was submitted to the JEMH board of directors for final approval. A subcommittee of the board of directors reviewed the packet and made a recommendation to the board for renewal of Dr. Bendorf's privileges. The board, consisting of both doctors and laypeople, granted Dr. Bendorf's requests for renewal of his privileges in 1999, 2000, 2002, 2004, 2005, and again in 2007, shortly before Hall's surgery.

The Joint Commission on the Accreditation of Hospitals (JCAH) is a national organization which promulgates standards, conducts surveys, and accredits hospitals. JEMH is accredited by the JCAH. In 2001, JCAH issued requests that JEMH make improvements in its credentialing of physicians. They were addressed by JEMH and

approved by JCAH. In 2004 and 2007, JEMH passed JCAH's survey in credentialing.

The Whipple procedure is a complicated surgery, involving the removal and reattachment of portions of several organs, including the pancreas, the small intestine, the stomach, the gallbladder, and the common bile duct. Of specific concern is the possibility of severing the patient's superior mesenteric vein (SMV). During the procedure on April 25, 2007, Dr. Bendorf did sever Hall's SMV. Although he was initially able to stop the bleeding, Hall began to bleed again when the surgery was resumed. Dr. Bendorf ultimately discontinued the procedure, and Hall was transferred by ambulance to the University of Nebraska Medical Center where the surgery was completed by another surgeon.

Hall was comatose for almost two months. She has since undergone repeated surgeries, including a three-organ transplant procedure, and continues to have health problems because of the failed surgery.

Hall and her husband sued Dr. Bendorf, JEMH, and Nebraska Methodist Health System, Inc. (NMHS).[2] The Halls settled with Dr. Bendorf, but their claims against JEMH and NMHS proceeded to a bench trial. The Halls alleged JEMH and NMHS were negligent in granting Dr. Bendorf privileges to perform the Whipple procedure.[3]

---

[2]NMHS is a nonprofit corporation affiliated with several different health care facilities, including JEMH, but does not itself provide health care services. Instead, NMHS provides its affiliates with certain business services, including information technology and marketing assistance.

[3]The Halls contended NMHS controlled the JEMH credentialing process and was itself negligent in granting Dr. Bendorf privileges to perform the Whipple procedure. The allegation of NMHS's control was based on evidence of the relationship between

The heart of the Halls' claim against JEMH and NMHS was that Dr. Bendorf did not have sufficient experience performing the Whipple procedure to support a grant of privileges for the procedure in 2007. He had performed only four Whipple procedures in the previous ten years and none in the three years preceding Hall's surgery. The parties disagreed whether the court should hold JEMH and NMHS to a "professional" standard of care or a "lay" standard of care when assessing whether they acted reasonably when they approved Dr. Bendorf's request for surgical privileges, specifically to perform the Whipple procedure. Both sides offered expert testimony and briefed the issue for the district court.

The district court issued its findings of fact, conclusions of law, and ruling on May 27, 2010. The district court first concluded that NMHS had the power to exercise control over the credentialing process at JEMH and accordingly, owed a duty to the Halls. The district court also concluded that, although this court has not explicitly recognized the tort of negligent credentialing, the overwhelming majority of courts that have considered the issue have recognized the cause of action, and the district court concluded it is a viable claim in Iowa. Having determined the plaintiffs had pled a cognizable tort under Iowa law, the district court concluded it should apply a nonprofessional standard of care in this case because the decision to reprivilege Dr. Bendorf was made by laypeople and involved nonmedical, administrative, or ministerial acts by a hospital. However, the district court concluded JEMH and NMHS did not

_____

JEMH and NMHS which authorized NMHS to appoint the CEO of JEMH and some of the directors serving on the board of JEMH.

breach the standard of care by granting Dr. Bendorf privileges to perform a Whipple procedure and entered judgment in favor of the defendants.

The Halls appealed, contending that although the district court was correct in its conclusion that a lay standard of care applied, the court actually applied a professional standard of care and the court erred in concluding JEMH and NMHS did not breach the applicable standard when granting Dr. Bendorf privileges to perform the Whipple procedure. The Halls also contend the district court made two erroneous evidentiary rulings. JEMH and NMHS cross-appealed, arguing the district court correctly concluded they did not breach a duty under the circumstances of this case, but contending the district court erred in failing to apply a professional standard of care. NMHS also asserts the district court erred in deciding NMHS owed the Halls a duty to exercise reasonable care in deciding whether to grant Dr. Bendorf privileges because it had no control over the granting or denying of privileges at JEMH.

**II. Scope and Standards of Review.**

Our review is for corrections of errors at law. Iowa R. App. P. 6.907. The district court's findings of fact have "the effect of a special verdict," *id.*, and "are binding on us if supported by substantial evidence," *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000). We review the district court's evidentiary rulings for an abuse of discretion. *Heinz v. Heinz*, 653 N.W.2d 334, 338 (Iowa 2002).

**III. Discussion.**

**A. Negligent Credentialing Cause of Action.** The Halls encourage us to use this appeal as an opportunity to recognize a cause of action for negligent credentialing in Iowa. The district court predicted that we would and allowed the claim to proceed to trial. However, the defendants JEMH and NMHS did not contend either in the district court

or on appeal that negligent credentialing is not actionable in Iowa. We assume without deciding that the tort is actionable in this state. As we find no reversible error in any of the district court's rulings challenged on appeal by the Halls, we conclude we need not decide the question whether the tort is actionable.[4]

**B. The District Court's Application of the Standard of Care.**
The parties disagree over the appropriate standard of care that should apply to allegations of negligent credentialing if the tort is recognized. The district court concluded a hospital's duty to its patients stems from the general duty to exercise reasonable care that arises whenever an actor's conduct creates a risk of harm, citing section 7 of the Restatement (Third) of Torts and *Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009). The district court further concluded that because the ultimate decision whether to grant privileges at JEMH was made by the board of directors, consisting of eleven lay members, there was "no basis for applying a professional standard of care to the decisions made by laypeople," relying on *Kastler v. Iowa Methodist Hospital*, 193 N.W.2d 98, 102 (Iowa 1971) (applying reasonable care standard in case involving an injury to a patient while showering in a hospital) and *University of Mississippi Medical Center v. Pounders*, 970 So. 2d 141, 148 (Miss. 2007) (applying lay standard of care in case involving injury to a patient caused by a hospital escort because the escort's conduct did not involve professional conduct). The district court concluded that the appropriate standard of care in this case was "reasonable care under the

---

[4]Prominent among the reasons we defer a decision on the existence of the tort of negligent credentialing is the fact that the defendants have not claimed the tort should not be recognized and we prefer to confront and decide the issue in a case in which the matter is disputed and briefed by the parties.

circumstances" and that expert testimony was not required to establish the standard.

The Halls assert the district court correctly concluded a "lay" standard of care should apply but contend the district court erred in actually applying a higher "professional" standard of care advocated by the defendants. The Halls support their argument by noting the district court's ruling referred to expert testimony introduced by the defendants evidencing the "customary practice of hospitals in the Midwest" and described this evidence as "compelling." The Halls argue this reference by the district court to the customary practice of hospitals coupled with the court's failure to expressly discuss and apply in its ruling the factors bearing upon the existence of a general duty to exercise reasonable care under section 7 of the Restatement (Third) of Torts together demonstrate the district court did not measure the defendants' conduct against a "lay" standard of care as it purported to.

Our review of the record and the district court's ruling does not support the Halls' argument. The district court clearly concluded the appropriate standard of care under the circumstances of this case was the lay standard advocated by the Halls—"reasonable care under the circumstances." Although the district court mentioned the defendants' evidence of custom, the court's ruling quoted *La Sell v. Tri-States Theatre Corp.*, 233 Iowa 929, 943, 11 N.W.2d 36, 44 (1943):

> The standard of custom cannot be substituted for the legal standard of reasonable or ordinary care under the circumstances. Following an approved method is merely evidentiary and is not conclusive on the question of ordinary care. The standard of care is ordinary care under the circumstances, and not what others have done under like circumstances.

The district court then noted it found the evidence of hospitals' customary practice "compelling" but "not necessarily conclusive."

Ultimately, the district court concluded "under an ordinary negligence analysis, defendants were not negligent in privileging and re-privileging Dr. Bendorf to perform a Whipple procedure at JEMH."

We conclude the district court applied the standard of care advocated by the Halls. We also conclude the district court's finding that JEMH and NMHS did not breach the standard is supported by substantial evidence. The record demonstrates that JEMH researched Dr. Bendorf's credentials and surgical record extensively before renewing his privileges to conduct general surgery. Dr. Bendorf's application received several levels of review from various committees within the hospital, many of them including surgeons and physicians who had special knowledge regarding whether a surgeon with Dr. Bendorf's experience would be qualified to perform a Whipple procedure even though he had not performed one in the recent past. Accordingly, we affirm the judgment of the district in favor of the defendants.

**C. The Defendants' Cross-Appeal.** Because we have concluded the district court's judgment in favor of the defendants should be affirmed, we find it unnecessary to address the defendants' argument that the district court should have applied a higher "professional" standard of care.

**D. NMHS's Cross-Appeal.** NMHS, in its cross-appeal, argues the district court unnecessarily and incorrectly concluded NMHS controlled the privileging process at JEMH and thus owed a duty to the Halls for granting privileges to Dr. Bendorf. NMHS argues that the district court's decision was tantamount to an advisory opinion given that the court concluded no breach of the duty of care occurred. However, because the district court found, and we now affirm, that NMHS breached no duty, any error in the district court's conclusion that NMHS owed a duty to the

Halls was rendered harmless. *See Grefe & Sidney v. Watters*, 525 N.W.2d 821, 826 (Iowa 1994).

**E**. **Evidentiary Rulings.** The Halls contend the district court erred in two evidentiary rulings. We will address each in turn.

1. *Lack of remedial measures.* The Halls contend the district court erred by refusing to let them present evidence that after the failed Whipple procedure on Hall, JEMH and NMHS did not change their credentialing policies or procedures. The Halls acknowledge that normally evidence of remedial measures is not admissible. Iowa R. Evid. 5.407 ("When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."). However, the Halls argue that the failure of JEMH and NMHS to change their credentialing policies and procedures after the unsuccessful surgery in this case is not evidence of subsequent remedial measures, but is evidence of a failure to undertake such measures. The Halls argue this evidence is not prohibited under rule 5.407 and is relevant to show that the procedures utilized by JEMH and NMHS were insufficient and unreasonable because they would purportedly allow Dr. Bendorf to perform the Whipple procedure after the disastrous results in Hall's case.

The district court excluded the evidence pursuant to rule 5.407 as evidence of remedial measures and also sustained an objection on relevance grounds. We conclude the district court did not abuse its discretion in excluding the evidence. We agree that the evidence is not relevant to any issue in this case. The theory actually advanced in this case was that JEMH and NMHS were negligent in renewing Dr. Bendorf's privileges in 2007. The district court did not abuse its discretion in

concluding the fact that JEMH and NMHS did not change their policies and procedures after the failed surgery is not probative of whether they acted negligently in granting Dr. Bendorf privileges before Hall's surgery. Accordingly, we conclude the district court did not abuse its discretion in excluding the evidence.

2. *Privileging documents.* The Halls also contend the district court erred in denying them access to the full privileging file on Dr. Bendorf while allowing the defendants to rely on some evidence from the privileging file at the trial. Specifically the Halls contend the district court erred in denying them access to a portion of the 2007 credentialing file and the entire 2009 credentialing file.

JEMH contends that the Halls have not preserved error on this claim, that they have not shown they were prejudiced by the denial of access to any part of the credentialing files, and that the Halls could have obtained the information elsewhere but did not try.

We conclude the Halls failed to preserve error on this issue. The record indicates most of the credentialing files were voluntarily disclosed to the Halls during discovery. When the Halls sought the remainder of the 2007 file and the 2009 file, the district court, relying on the court of appeals decision in *Day v. Finley Hospital*, 769 N.W.2d 898, 901 (Iowa Ct. App. 2009), concluded credentialing files were protected from disclosure under the peer review statute, Iowa Code section 147.135 (2009). We recently held the privilege protecting peer review documents was not waived by a hospital despite its use of some of them as exhibits in a prior trial in the same case. *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 806 N.W.2d 282, 291 (Iowa 2011).

However, the Halls contend on appeal this case is distinguished from *Cawthorn* because JEMH and NMHS used some of the peer review

records as a sword while relying on the peer review privilege as a shield. We adverted to the "sword and shield" problem in *Cawthorn*, noting that other cases have held that "as a matter of fairness, a party cannot simultaneously rely on peer review materials for its defense while asserting the privilege" against disclosure of the materials to the other party. *Id.* at 290. However, as we were not presented with a sword and shield scenario in *Cawthorn*, we have not determined how the peer review privilege would apply in such a situation. *Id.* Although the Halls objected when the district court refused to order the discovery of the privileging files (when the privilege was being used as a shield), the Halls expressly waived any objection when JEMH sought to use the privileged documents by introducing them as evidence during trial. Because an objection to the admission of evidence at trial is required for our review on appeal, we conclude error has not been preserved on this issue. *See* Iowa R. Evid. 5.103(*a*); *State v. Martin*, 704 N.W.2d 665, 669 (Iowa 2005).

**IV. Conclusion.**

We affirm the judgment of the district court in favor of the defendants. As we noted in our order denying the appellants' motion to strike the appellees' designation, we have considered the appellants' argument that the appellees caused unnecessary matters to be included in the appendix and conclude costs should be taxed to the appellant.

**AFFIRMED.**

All justices concur except Wiggins, J., who concurs specially.

*Hall v. Jeannie Edmundson Mem'l Hosp.*

**WIGGINS, Justice (concurring specially).**

I concur, but write specially concerning the evidentiary ruling regarding the district court's failure to grant the Halls access to portions of the 2007 credentialing file and the entire 2009 credentialing file. The Halls, in requesting the credentialing files, failed to limit their request to the items contained in the credentialing files that did not include the credentialing committee's work product in determining whether the hospital should have credentialed Dr. Bendorf to do Whipple procedures.[5] As I wrote in my concurring opinion in *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, we have not adopted the court of appeals' decision in *Day v. Finley Hospital*, 769 N.W.2d 898 (Iowa Ct. App. 2009). *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 806 N.W.2d 282, 293 n.7 (Iowa 2011) (Wiggins, J., concurring specially). The Halls only claimed that they were entitled to the credentialing files because the hospital used some of the items in the credentialing files in litigating its case. The Halls did not claim that Iowa Code section 147.135 (2009) did not protect certain items contained in the credentialing files. Accordingly, I concur that, under this record, the Halls were not entitled to the credentialing files they sought to obtain from the hospital.

---

[5]Examples of items in a credentialing file that are not work product of the credentialing committee may include the application submitted by the physician seeking credentialing, any medical records reviewed by the credentialing committee, any transcripts of the physician's training, any records not generated by a peer review committee as to a physician's prior discipline, or any written material provided by a third party to the committee commenting on a physician's qualifications. Work product may include analysis of the records reviewed by the credentialing committee or other written documents containing the credentialing committee's mental thoughts regarding the physician's qualifications.